AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of Ohio

FILED
RICHARD W. NAGEL
CLERK OF COURT
2019 DEC 11 AM 9:47

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
Email accounts associated to JAMES R. GORD; Male )
Born: ▮▮▮▮▮ Ohio; and AMANDA F. SAVINO; )
Female Born: ▮▮▮▮▮ Florida )

3:19mj709

Case No. 181001-34391190801659

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

SEE ATTACHMENT A

located in the ___Southern___ District of ___Ohio___, there is now concealed *(identify the person or describe the property to be seized)*:

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC 287 | False, Fictitious or Fraudulent Claims |
| 18 USC 641 | Embezzlement/Misuse of Government Property |

The application is based on these facts:

SEE ATTACHED AFFIDAVIT

- ☑ Continued on the attached sheet.
- ☑ Delayed notice of __30__ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Jackie Horton*
Applicant's signature

JACQUELINE HORTON, Special Agent, AFOSI
Printed name and title

Sworn to before me and signed in my presence.

Date: 12/11/2019

*[signature]*
Judge's signature

City and state: DAYTON, OHIO

MICHAEL J. NEWMAN, U.S. MAGISTRATE JUDGE
Printed name and title

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

IN THE MATTER OF THE SEARCH
OF INFORMATION ASSOCIATED WITH

THAT IS STORED AT PREMISES CONTROLLED
**GOOGLE, INC** AND **YAHOO!**.

3:19 mj 709

Case No. 181001-34391190801659

**Filed Under Seal**

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Jacqueline Horton (hereinafter listed as your affiant), after being first duly sworn upon oath, depose and state:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant for information associated with certain accounts that are stored at premises controlled by Google, Inc and Yahoo!, an email provider headquartered at Google, Inc, 1600 Amphitheatre Parkway, Mountain View, CA and Yahoo!, 701 First Avenue, Sunnyvale, CA. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for search warrants under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google, Inc and Yahoo! to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Attachment B.

2. I, Jacqueline Horton, am a Special Agent with AFOSI 10 FIS, WPAFB, OH, after being duly sworn, declare as follows: I received training to be a Federal Agent in 2018 at the Criminal Investigator Training Program at the Federal Law Enforcement Training Center (FLETC), Glynco, GA, with further training at the United States Air Force Special Investigations Academy also at Glynco, GA. During the 20-week course, I studied topics such as criminal law, the 4th Amendment, search and seizure, surveillance, interrogations, arrest techniques and defensive tactics. In addition to my professional education and training, I relied on the training and experience of Matthew Blocker, who is also a Special Agent with AFOSI 10 FIS, WPAFB, OH. SA Blocker has been an accredited Federal Agent for AFOSI since July of 2009. He also received training to be a Federal Agent at the Criminal Investigator Training Program at FLETC, Glynco, GA, with further training at the United States Air Force Special Investigations Academy also in Glynco, GA. During the 20-week course, he studied topics such as criminal law, the 4th Amendment, search and seizure, surveillance, interrogations, arrest techniques and defensive tactics. Additionally, SA Blocker completed additional advanced training into interviewing children and investigating sex offenses at FLETC, Glynco, GA, in 2012, securing and previewing digital evidence in New York, NY in 2012, and providing counterintelligence support to research, development, and acquisitions assets at the Joint Counterintelligence Training Center, Quantico, VA in 2018.

3. Along with other agents and investigators, I have been conducting an investigation into the violation of the federal offenses described in Attachment C, which are believed to have been committed by **JAMES R. GORD** (hereinafter **GORD**); Male Born: ███████████████████████ DR-4; Air Force Research Laboratory, Hypersonics Directorate (AFRL/RQ), Wright-Patterson AFB, OH and **AMANDA F. SAVINO** (hereinafter **SAVINO**); Female Born: ████████████████████████ Contractor, Innovative Scientific Solutions Incorporated, Wright-Patterson AFB, OH. The particular offenses are listed below.

4. I have reason to believe particular email accounts may contain evidence identifying records, receipts, collaboration, travel, and possible witness(es) to the crimes outlined below, and further described in Attachment B.

5. Based on my training and experience and the facts set forth in this Affidavit, there is probable cause to believe violations of the following federal statutes may have been committed by **GORD**: 18 USC 1384, Prostitution Near Military and Naval Establishments, 18 USC 287, False, Fictitious or Fraudulent Claims, 18 USC 641, Embezzlement/Misuse of Government Property, 18 USC 1001, False Statements, 18 USC 872, Extortion of Officers or Employees of the United States, 18 USC Sec 7 & 13 which assimilate ORC 2927.12, Ethnic Intimidation and ORC 2903.21, Aggravated Menacing. There is probable cause to believe **SAVINO** has violated the following offenses: 18 USC 1384, Prostitution Near Military and Naval Establishments, 18 USC 287, False, Fictitious or Fraudulent Claims.

6. This Affidavit does not contain every fact known to the investigation, but only those deemed necessary to demonstrate sufficient probable cause to support the issuance of the requested search warrant. As part of the investigation, I have reviewed documentation; electronic records and reports and discussed information with other agents and investigators involved in the investigation. For purposes of this Affidavit, I have not distinguished between information of which I have direct knowledge and that of which I have indirect knowledge.

## JURISDICTION

7. This Court has jurisdiction to issue the requested warrant because it is, "a court of competent jurisdiction," as defined by 18 U.S.C. § 2711. Specifically, this Court is a district court (including a magistrate judge) of the United States which has jurisdiction over the offenses being investigated in this matter. 18 U.S.C. § 2711(3)(A)(i).

## STATEMENT OF PROBABLE CAUSE

### BACKGROUND OF INVESTIGATION

8. This investigation was initiated on 21 March 2019 based upon information provided by Civ (Dr) SUKESH ROY (herein after ROY), Defense Contractor, Spectral Energies, Dayton, OH that GORD was engaging in unethical government contract negotiations, had communicated threats of violence, and was regularly soliciting prostitution while on the installation and while traveling on official U.S. Air Force business.

On 15 March 2019, SA BLOCKER and SA ROBERT KRING, AFOSI 10 FIS, WPAFB, OH interviewed ROY at AFOSI 10 FIS. ROY provided a signed, sworn statement and verbally relayed the following information: ROY is the owner of Spectral Energies, which has contracted with AFRL and the Air Force for approximately 17 years. During that time, ROY'S company has been under contract to provide unclassified laser imagining of turbine engines for AFRL. GORD has served as the senior research scientist over the technology Spectral Energies supports and has been responsible for the funding

---

AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS                                                   Page 2 of 13

for the contract. The two men, ROY and GORD, have known each other for the entire time Spectral Energies has been a contractor with AFRL. While their relationship began as a professional acquaintance, the two men became friends, as well.

In 2017, GORD lost his father to suicide and experienced severe depression as a result. Shortly thereafter, in October 2017, ROY shared with GORD he was looking to hire an administrative technician at Spectral Energies. GORD recently met a young professional while on a flight to Washington, D.C., later identified as SAVINO. GORD went on to say he sat next to SAVINO on the plane and was very impressed with how she presented herself. GORD said he believed SAVINO would be a good fit for ROY's company and provided ROY a copy of SAVINO's resume. GORD highly encouraged ROY to hire SAVINO, speaking favorably of SAVINO's technical expertise. He then finished by stating, "she's also really hot." At GORD's urging, ROY hired her into the administrative technician position at Spectral Energies, effective November 2017.

After her hiring, ROY quickly grew frustrated with SAVINO's lack of capability in the position. Over the first few months on the job, ROY stated SAVINO was not timely with her suspenses, did not fully understand how to use basic word processing and document creation software, and struggled to formulate coherent interoffice emails. SAVINO also failed to provide her college transcripts as requested. ROY later learned her resume was fabricated with degrees and qualifications she did not possess. ROY confronted GORD with this concern and GORD admitted he was having an intimate relationship with SAVINO.

GORD disclosed SAVINO was a prostitute he met in Cincinnati, OH and reported he kept a spreadsheet on his government issued laptop detailing prostitutes in various cities around the U.S. he patronized for sex while on official U.S Government travel. GORD told ROY he did not want his wife or children to know about his relationships with these women. GORD told ROY he would take out cash advances against his government travel card (GTC) to pay these women so that the family finances were not visibly affected.

GORD further relayed prior to her employment at Spectral Energies, he met with SAVINO on several occasions and paid her $400 dollars an hour for various sexual acts. Through this regular engagement, GORD declared his love for SAVINO and she declared hers for him. Told to ROY, and substantiated by subsequent lawful searches of his government issued cell phone, the two communicated via GORD's government issued iPhone and he routinely received sexually explicit text messages and images from SAVINO. Subsequent evidence has also substantiated SAVINO has engaged in acts of prostitution near WPAFB with other civilian employees including Dr I. K. (hereinafter IK), Defense Contractor, Ballistic Missile Systems Integration Flight (SMBI), National Air and Space Intelligence Center (NASIC), WPAFB, OH. Told to ROY, GORD reported IK paid SAVINO approximately $20K per year to clean his residence in the nude and then perform oral sex on him.

GORD also shared he brought SAVINO with him when he attended a research collaboration meeting at Purdue University with Civ (Dr) TERRENCE MEYER, Professor of Mechanical Engineering, School of Engineering, Purdue University, West Lafayette, IN. SAVINO in turn invited her "friend" to come and visit Purdue, an Irish-national residing in Vancouver, Canada. GORD believed this man might have been another romantic partner of SAVINO's.

Despite her lack of an actual degree, GORD urged ROY to involve SAVINO more with the technical research GORD oversaw in Spectral Energies contracts. He even asked for her name be included in future "white paper" publications (Agent Note: A "white paper" is an unclassified publication released on open source channels which outlines research efforts or discoveries). GORD also asked ROY to ensure SAVINO was the Spectral Energies representative on any AFRL/RQ temporary duties (TDY)

out of the greater Dayton, OH area. ROY refused both requests, citing SAVINO's position with the company as an administrative technician and because she was not a technical expert in their field. ROY further outlined his ethical concerns surrounding GORD's romantic relationship with SAVINO and asked him to cease all contact with her. This angered GORD and ultimately ended all discussion between ROY and GORD about SAVINO.

Due to her substandard work performance and the apparent inappropriate relationship with the program manager overseeing his company's work, ROY met with his attorney to discuss SAVINO's termination from Spectral Energies. ROY reported he was advised to wait until SAVINO's one year review in November 2018 to release her from employment as this limited the company's potential liability. When he learned of ROY's plan to terminate SAVINO, GORD told ROY he was the only person with whom GORD confided all these details of his personal life, stating if anyone ever learned about the true nature of his relationship with SAVINO, GORD would know ROY was the one who leaked this information. GORD then stated he would come to Building 5 with one of his many guns to "end it all." ROY perceived this to mean that GORD would kill ROY and then himself. During the conversation, GORD also reminded ROY, of Bangladeshi ethnicity, that GORD was a senior research scientist at AFRL, and that as ROY was an immigrant the "old boys club" at AFRL would never believe ROY if he disclosed the information about a scientist as well respected as GORD.

In October 2018, approximately two weeks before her one-year review, SAVINO told ROY she was resigning from Spectral Energies. Shortly thereafter, ROY learned SAVINO was hired as an administrative technician at ROY's competitor company, Innovative Scientific Solutions Incorporated (ISSI), that she was being cited as a technical research assistant on a pending ISSI publication, and that she was traveling with GORD to various scientific conferences on behalf of ISSI.

Around this same time, Spectral Energies was due to receive a renewal of the $250K research grant from AFRL. Spectral Energies had been the recipient of such grants, totaling $1 million dollars per year, for over ten years. GORD was the party responsible for the allocation of those funds. Upon delivery of the funds however, Spectral Energies only received $100K. ROY inquired with the WPAFB Contracting Office and was informed GORD split the contract between Spectral Energies and ISSI with the remaining $150K going to ISSI. While ISSI is a competitor to Spectral Energies, this was the first time in years that GORD did not allocate his entire research budget to Spectral Energies. The timing of GORD's decision corresponded to SAVINO's new position at ISSI.

In an audio recording GORD made with his U.S. Government issued iPhone, SAVINO expressed concern that her time at Spectral Energies may be cut short due to ROY. GORD stated "if push comes to shove" and ROY does not agree to keep SAVINO, GORD will move funds from ROY's contract to ISSI so she can be hired on with money for her new salary. GORD expressed confidence that ISSI would hire SAVINO. GORD told her ROY called people who worked for the government "blue lanyards" as government employees wore blue lanyards for their badges and contractors wore green. ROY disliked the fact that government employees controlled his money. GORD stated on the recording, "I'll show him the fucking blue lanyard!" if ROY fired SAVINO from Spectral Energies.

Over the next few months, several colleagues shared with ROY that GORD was introducing SAVINO around professional circles as a research assistant. ROY learned GORD had arranged for SAVINO to chair a scientific panel at an upcoming Research and Applications of Photonics in Defense (RAPID) conference as a technical expert. During this time, a colleague informed ROY that the vice president of ISSI (the contract recipient of a large portion of the money previously awarded to Spectral Energies), Dr. JOHN HOKE, was surprised ROY allowed SAVINO to leave Spectral Energies considering how important she was to GORD.

---

AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS                     Page 4 of 13

On 1 April 19, your affiant and SA BLOCKER reviewed SAVINO's resume and then contacted the University of Tennessee, Knoxville, the University of South Florida, and the Ohio Department of Public Safety to verify SAVINO's attendance and graduation from each of these academic institutes. None of the aforementioned organizations had any record of SAVINO as a student or graduate.

On 9 April 2019, your affiant, SA BLOCKER, SA RICK SEITZ, and SA NATHANIEL APELAND, AFOSI 10 FIS, WPAFB, OH executed a federal search warrant at SUBJECT GORD's office in Building 5 on Area B for electronic digital media, electronic storage, electronic and hardcopy records, and paper receipts. During this search, AFOSI 10 FIS located the following items: one Western Digital hard drive, one MacBook Pro Laptop, one Western Digital IDE hard drive, one MyPassport portable hard drive, and various documents/printed emails/text records/and receipts. While searching a standing cabinet in the office, your affiant discovered a desk drawer containing a box of Trojan condoms, a pair of female underwear, empty prescription pill bottles, and several folders containing SUBJECT GORD's journal entries and several printed emails. The condom box label indicated 12 condoms however only ten condoms were located inside. The label on the prescription identified "JAMES GORD" and contained 20MG tablets of Sildenafil, a vasodilator used to treat erectile dysfunction. The directions on the bottle indicated, "Take 1 – 5 tablets by mouth as needed." All aforementioned items were collected, tagged, and logged into evidence by AFOSI.

From 26 April 2019 to 5 May 2019, your affiant and SA BLOCKER reviewed GORD's U.S. Government emails from June 2016 to 1 April 2019. On 21 November 2017, GORD sent SAVINO an email to her personal account ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ at 0043 hours outlining several work related items. He then went on to remind SAVINO to archive data associated with her personal email account as she transitioned into her new role as a system administrator. GORD concluded this email by stating he, "fancied [himself]" as her mentor.

On 27 May 2019, your affiant and SA BLOCKER conducted a review of several documents recovered from GORD's office at Building 5. The first notable document was a printed email from ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ titled, "Employment" delivered Monday 9 October 2017. The email was addressed "Good morning, Amanda [SAVINO]!" and signed, "Jim [GORD]." The first paragraph discusses how GORD would be talking to ROY about SAVINO's employment at WPAFB, OH. GORD then acknowledged this conversation would, "push the envelope" in terms of GORD's friendship with ROY, GORD's marriage, and his career. The next paragraph discusses the importance of establishing a strong "backstory." GORD reiterated the point that their stories must be in sync with one another, be simple, and be as near to the truth as possible. Based upon your affiant's experience and the context of these emails, there is probable cause to believe "Jim" is GORD and "Amanda" or "Mandi" is SAVINO.

According to the email, the story SAVINO was to use was that GORD and SAVINO met on a plane from Dayton, OH to Dallas, TX in January 2017 where they were seated next to one another. GORD was working on a project on his laptop when the email recipient, SAVINO, noticed it and the two began a conversation. SAVINO was interested in this presentation based on her background, a biochemistry degree from the University of Tennessee, Knoxville, and attendance at the University of Cincinnati medical school. SAVINO was to maintain she had an associate's degree in art from the University of South Florida and a bachelor's degree in biochemistry from University of Tennessee, Knoxville. SAVINO was to state she was attending medical school at the University of Cincinnati and was a certified firefighter and EMT. SAVINO was to say she underwent a recent difficult divorce which caused her a financial strain that required she withdraw from medical school. The story was that SAVINO shared these issues with GORD over meetings on several occasions. GORD then briefly dispenses with the backstory and identifies he and SAVINO actually met on 11 separate occasions, eight of which were personal meetings and three of which were business meetings where GORD taught

AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS           Page 5 of 13

SAVINO about AFRL and how to interact with scientists. Within the context of their shared backstory, these meetings were always in public locations and did not involve any physical intimacy.

In the email, GORD then explained he and SAVINO would contact ROY and propose SAVINO be first brought on as a part-time hire. GORD would then later advocate for SAVINO to be brought on as a full-time employee with benefits. The email concluded with a reinforcement of two upcoming meetings between them, 10 October 2017 in Dayton, OH and 13 – 14 October 2017 in Indianapolis, IN. Subsequent research and investigation has revealed this "story" is almost entirely untrue, fabricated in email and person by GORD and SAVINO.

The second notable document seized during the search was a printed email from "Maud Dib ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ to '▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮' titled, "Some Thoughts for the 'Indy' Trip" delivered Thursday, 12 October 2017. Based on research and common sense, there is probable cause to believe the sender is GORD and the recipient is SAVINO. The email opens with "My Dearest, Amanda." GORD then identified the send and receive email addresses were updated from the older addresses of '▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮' and '▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮' GORD goes on to write about meeting up in Cincinnati, OH following a committee meeting. The email then discusses how GORD planned to finance the get together, citing he recently gave SAVINO $500 dollars for a separate trip to Washington, D.C. GORD committed to compensating SAVINO in cash as a paper or electronic trail of these transactions was not desired by both parties.

The subsequent two paragraphs discuss working on a professional resume for SAVINO, as well as obtaining SAVINO's official transcripts and reference letters to provide to ROY. GORD then recommends SAVINO review the Spectral Energies company website prior to her job interview with ROY.

The email then transitions into a section titled, "***Personal Activities***" where GORD discusses, "playtime" and expresses an interest in maintaining this aspect of their existing relationship. GORD goes on to remind SAVINO that he likes "sexy lingerie" among other erotic clothing items. GORD then requests SAVINO to bring the "Screaming O," (Agent Note: a request that SAVINO orgasm during sex) and discusses how sleeping in the same bed next to one another was very important to him. GORD explained how he slept next to "Renee" almost every night for 31 years of their marriage and that this intimacy was important. GORD signed the email, "Good night, my dear! Jim."

Your affiant and SA BLOCKER also reviewed a Word document titled, "Email 20170622." This document was created by GORD on 22 June 2017 and opens with the line, "Dearest Mandy"[SAVINO]. The document discusses how GORD wants to meet with SAVINO on his way back from Argonne National Laboratory outside Chicago, IL on Sunday, 2 July 2017. GORD explained he was comfortable meeting SAVINO subsequent to her meeting with another client. He goes on to write their official meetings through Discreet Desires (a Cincinnati-based escort service that employed SAVINO and which GORD used extensively) were for an hour but as this would be an unofficial meeting he was hoping for more time with SAVINO. GORD then explains his "Mandy funds" were critically low and although he made two recent trips with Washington, D.C. he had not yet been reimbursed. The email then transitions to a section titled "***WRIGHT-PATTERSON AIR FORCE BASE – SOME DETAILS***" Here, GORD offers a response to SAVINO's recent text message about employment at WPAFB. GORD outlines his position at AFRL and the organizational structure of the Combustion and Laser Diagnostics Research Complex (CLDRC) at AFRL. He then names several key officials and their positions within AFRL and includes hyperlinks to open source websites about the laboratory and WPAFB. GORD then describes the layouts of Area A and Area B, and includes a map to better explain where CLDRC is located on Area B and how to best access the building via Gate 22B off I-675. This email is signed, "Jim."

AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS                                                Page 6 of 13

The next text document reviewed was dated 18 October 2017 and includes the email address [REDACTED]. Under a section labeled, "Physical relationship/financial model," the following information was listed: "I.K., Harvey, past weekend, $900, Recalibrate (travel, etc.)." All of these entries occurred while SAVINO was going through the hiring process at Spectral Energies with ROY.

On 7 June 2019, your affiant and SA BLOCKER received three requests for information (RFI) from Headquarters AFOSI regarding travel records associated to GORD and SAVINO. A review of these documents indicated a traveler with the same name as SAVINO had international travel to Iceland, Australia, Ireland, the United Kingdom, and Turkey between April 2016 and September 2018. However, these trips could not be directly attributed to her without further identifying information. A review for records associated to her in the Airline Reporting Corporation (ARC) indicated she took several domestic flights within the United States from 2016 to 2018. This report also identified SAVINO paid for several of those flights using cash.

On 2 July 2019, SA BLOCKER submitted preservation requests to Google, Inc, Yahoo!, and Microsoft to preserve content at the following addresses: Yahoo! email addresses: [REDACTED] Hotmail email: [REDACTED] and Google emails: [REDACTED] and [REDACTED].

On 31 July 2019, a DoD Inspector General Subpoena was submitted to the aforementioned service providers requesting subscriber information on each account based upon probable cause established in the previous paragraphs. Further investigative steps revealed the emails requested [REDACTED] and [REDACTED] were all deleted by their respective users and as such were no longer available for review. Additionally, [REDACTED] was not associated to SAVINO. The response from Yahoo! indicated the email address, [REDACTED], was created on 21 February 2011 by "James Gord" and last accessed on 13 June 2019. The email address, [REDACTED] was created on 15 May 2017 by "Amanda Savino Frederick" and was last accessed on 12 April 2019. The email address, [REDACTED] was created on 17 October 2017 by "Amanda Savino" and was last accessed 7 June 2019.

On 1 August 2019, your affiant and SA BLOCKER conducted a preliminary review of a forensic copy of GORD's U.S. Government laptop hard drive and discovered several items of interest. GORD had screen captures of several profiles from the Discreet Desires webpage which included nude and lingerie photos and the hourly rates of various women. Another Excel document titled, "Burner Log," was created on 2 October 2017 and was an electronic cellphone extraction containing text message content from 22 June 2015 to 16 November 2018 between GORD and 27 different female escorts in different cities within the U.S. In one of these conversations, GORD asked an escort to contact him at email [REDACTED] for a rendezvous at a hotel in Chicago, IL this corresponded with a work trip to Argonne National Laboratory, Lemont, IL, approximately 40 minutes from Chicago, which occurred during that timeframe. Many of 27 women listed on the Excel document were foreign nationals from countries considered U.S. National Security concerns.

Based upon the location of the seized emails, the details within, and the names of the author and recipient, your affiant has probable cause to believe there is additional evidence of the crimes listed in Attachment C contained within GORD and SAVINO's personal email accounts, listed in Attachment A.

**BACKGROUND CONCERNING EMAIL**

9. In my training and experience, I have learned that Google, Inc and Yahoo! provide a variety of on-line services, including electronic mail ("email") access, to the public. Google, Inc and Yahoo! allow subscribers to obtain email accounts at the domain names yahoo.com and gmail.com, like the email account[s] listed in Attachment A. Subscribers obtain an account by registering with Google, Inc and Yahoo!. During the registration process, both Google, Inc and Yahoo! ask subscribers to provide basic personal information. Therefore, the servers and archived files of Google, Inc and Yahoo! are likely to contain stored electronic communications (including retrieved and unretrieved email for both Google, Inc and Yahoo! subscribers) and information concerning subscribers and their use of Google, Inc and Yahoo! services, such as account access information, email transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

10. A Google, Inc or Yahoo! subscriber can also store files with the provider in addition to emails, such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to emails), and other files, on servers maintained and/or owned by Google, Inc or Yahoo!. In my training and experience, evidence of who was using an email account may be found in address books, contact or buddy lists, email in the account, and attachments to emails, including pictures and files.

11. In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account. Such information may include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and experience, I know that even if subscribers insert false information to conceal their identity, this information often provides clues to their identity, location, or illicit activities.

12. In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems. This information may include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

13. In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user.

14. As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account. This "user attribution" evidence is

AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS                                                     Page 8 of 13

analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the email provider can show how and when the account was accessed or used. For example, as described below, email providers typically log the Internet Protocol (IP) addresses from which users access the email account, along with the time and date of that access. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (*e.g.*, location information integrated into an image or video sent via email). Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).

## CONCLUSION

15. Based on the forgoing, I request the Court issue the proposed search warrants for data, contents, and account information, more thoroughly detailed in Attachment B.

16. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute these warrants by electronically serving the warrants on Google, Inc and Yahoo!.

## REQUEST FOR SEALING

17. I further request the Court order all papers in support of this application, including this affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

Respectfully submitted,

*Jackie Horton*

JACQUELINE T. HORTON, SA, USAF
AFOSI 10 FIS, WPAFB, OH

Subscribed and sworn to before me this 11th day of December, 2019.

MICHAEL J. NEWMAN, U.S. MAGISTRATE JUDGE    12/11/19

---

AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS                     Page 9 of 13

## ATTACHMENT A

### PLACES TO BE SEARCHED

This warrant applies to information associated with Google, Inc that is stored at premises owned, maintained, controlled, or operated by Google, Inc, a company headquartered at Google, Inc, 1600 Amphitheatre Parkway, Mountain View, CA.

Based upon the above-mentioned information, I believe there is sufficient probable cause to search the following email addresses owned by GORD and SAVINO:

[redacted]

This warrant applies to information associated Yahoo! that is stored at premises owned, maintained, controlled, or operated by Yahoo!, a company headquartered at 701 First Avenue, Sunnyvale, CA.

Based upon the above-mentioned information, I believe there is sufficient probable cause to search the following email addresses owned by GORD and SAVINO:

[redacted]

## ATTACHMENT B

PARTICULAR THINGS TO BE SEIZED

I. **Information to be disclosed by Google, Inc and Yahoo!**

To the extent that the information described in Attachment A is within the possession, custody, or control of Google, Inc and Yahoo!, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that have been deleted but is still available to the Provider, or have been preserved pursuant to the requests made under 18 U.S.C. § 2703(f) on **2 July 2019** and **17 November 2019** the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

    a.    The contents of all emails associated with the account **1 January 2009 to 1 October 2019**, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, the date and time at which each email was sent, and the size and length of each email;

    b.    All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

    c.    The types of other services utilized;

    d.    All records or other information stored by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files; and

    e.    Items of evidence to be Seized and Searched within GORD and SAVINO's personal email accounts include:

        i.    Correspondence between GORD and SAVINO
        ii.    Correspondence between SAVINO and IK
        iii.    Correspondence between SAVINO and Discreet Desires or escort customers
        iv.    Correspondence between GORD and any escort services
        v.    Records involving travel

Once such items of evidence are seized, all such evidence will be searched for informational evidence.

---

AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS         Page 11 of 13

## ATTACHMENT C

FEDERAL CITATIONS

1.  ***18 USC § 1384, Prostitution Near Military and Naval Establishments*** - Within such reasonable distance of any military or naval camp, station, fort, post, yard, base, cantonment, training or mobilization place as the Secretary of the Army, the Secretary of the Navy, the Secretary of the Air Force, or any two or all of them shall determine to be needful to the efficiency, health, and welfare of the Army, the Navy, or the Air Force, and shall designate and publish in general orders or bulletins, whoever engages in prostitution or aids or abets prostitution or procures or solicits for purposes of prostitution, or keeps or sets up a house of ill fame, brothel, or bawdy house, or receives any person for purposes of lewdness, assignation, or prostitution into any vehicle, conveyance, place, structure, or building, or permits any person to remain for the purpose of lewdness, assignation, or prostitution in any vehicle, conveyance, place, structure, or building or leases or rents or contracts to lease or rent any vehicle, conveyance, place, structure or building, or part thereof, knowing or with good reason to know that it is intended to be used for any of the purposes herein prohibited.

2.  ***18 USC § 287, False, Fictitious or Fraudulent Claims*** - Whoever makes or presents to any person or officer in the civil, military, or naval service of the United States, or to any department or agency thereof, any claim upon or against the United States, or any department or agency thereof, knowing such claim to be false, fictitious, or fraudulent.

3.  ***18 USC § 641, Embezzlement/Misuse of Government Property*** - Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof; or whoever receives, conceals, or retains the same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted.

4.  ***18 USC § 1001, False Statements*** - (a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully—
    (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
    (2) makes any materially false, fictitious, or fraudulent statement or representation; or
    (3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;

5.  ***18 USC § 872, Extortion by Officers or Employees of the United States*** - Whoever, being an officer, or employee of the United States or any department or agency thereof, or representing himself to be or assuming to act as such, under color or pretense of office or employment commits or attempts an act of extortion.

6.  ***18 USC §§ 7 & 13 which assimilate Ohio Revised Code (ORC) 2927.12, Ethnic intimidation*** - 2927.12 (A)No person shall violate section 2903.21 (Aggravated Menacing), 2903.22 (Menacing), 2909.06 (Criminal Damaging or Endangerment), or 2909.07 (Criminal

---

Mischief), or division (A)(3), (4), or (5) of section 2917.21 (Telecommunications Harassment) of the Revised Code by reason of the race, color, religion, or national origin of another person or group of persons.

***18 USC §§ 7 & 13 which assimilate ORC 2903.21, Aggravated Menacing*** - (A) No person shall knowingly cause another to believe that the offender will cause serious physical harm to the person or property of the other person, the other person's unborn, or a member of the other person's immediate family. In addition to any other basis for the other person's belief that the offender will cause serious physical harm to the person or property of the other person, the other person's unborn, or a member of the other person's immediate family, the other person's belief may be based on words or conduct of the offender that are directed at or identify a corporation, association, or other organization that employs the other person or to which the other person belongs.